## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER SNEAD, | ) | CASE NO. 1:19cv2754 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Jennifer Snead ("Plaintiff" or "Snead"), challenges the final decision of Defendant,

Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her application for a

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§

416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This

case is before the undersigned United States Magistrate Judge pursuant to an automatic referral

under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the

Magistrate Judge recommends that the Commissioner's final decision be VACATED and

REMANDED for further consideration consistent with this opinion

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

## I.  PROCEDURAL HISTORY

Snead filed a prior application for a Period of Disability, Disability Insurance Benefits and SSI on September 23, 2013.  ((Transcript ("Tr.") at 98.)  A hearing was held in her appeal of that case on January 14, 2016.  (*Id*. at 56-94.)  On March 2, 2016, an administrative law judge ("ALJ") issued an unfavorable decision in that case. (*Id*. at 95-122.)  On September 23, 2016, the Appeals Council declined further review.  (*Id*. at 248.)

On March 1, 2017, Snead filed an application for SSI, alleging a disability onset date of February 27, 2016 and claiming she was disabled due to chronic pain, depression, anxiety, PTSD, ADHD, sleep apnea, scoliosis, high blood pressure, diabetes, and asthma.  (*Id*. at 251.)  The applications were denied initially and upon reconsideration, and Snead requested a hearing before an ALJ.  (*Id*. at 152-58, 164-68, 170-72.)

On July 19, 2018, an ALJ held a hearing, during which Snead, represented by counsel, and an impartial vocational expert ("VE"), testified.  (*Id*. at 35-53.)  On December 5, 2018, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id*. at 12-33.)  The ALJ's decision became final on September 27, 2019, when the Appeals Council declined further review.  (*Id*. at 1-6.)

On November 22, 2019, Snead filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11, 13, 14.)  Snead asserts the following assignments of error:

> 1. The ALJ failed to properly apply the doctrine of *res judicata* when he found that the earlier decision of the ALJ in her prior application was binding and that there had not been any new or material change.
>
> 2. The ALJ failed to properly evaluate the evidence and give controlling weight to the opinions of the treating psychiatrist in violation of 20 C.F.R. § 416.927 along with failing to properly consider Social Security Rulings 02-1p1 and 14-2p.

3. The ALJ's determination regarding credibility was not supported by substantial evidence and violated Social Security Ruling 16-3p.

4. The ALJ did not meet his burden at Step Five of the Sequential Evaluation.

(Doc. No. 11 at 1.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Snead was born in May 1983, and was a "younger" person under social security regulations at all relevant times.  (Tr. 210.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a fast food worker.  (*Id*. at 49.)

### B.    Relevant Medical Evidence[2]

### 1.    Mental Impairments

On June 16, 2015, Snead received mental healthcare at FrontLine Service, for treatment of dysphoria, worthlessness, increased or decreased sleep, and suicidal ideation. (*Id*. at 501-04.)   The file indicated that her behavioral health was usually treated at Care Alliance. (*Id*. at 501.)

On January 4, 2016, Snead received counseling at Care Alliance.  (*Id*. at 481.)  Her symptoms included anxiety, depressed mood and tearfulness.  (*Id*.)  Her condition was described as "not changed" from previous visits.  (*Id*.)  She was assessed with moderate episode of recurrent major depression and PTSD.  (*Id*. at 282.)

On January 15, 2016, Snead received counseling at Care Alliance.  (*Id*. at 476.)  Her symptoms included anxiety, depressed mood, difficulty concentrating, feelings of worthlessness and

---

[2]  The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

guilt, irritability, psychomotor agitation, decreased concentration, fatigue, irritability, obsessive thoughts, social anxiety, avoidance, flashbacks, hyper vigilance increased startle, and intrusive memories.  (*Id*. at 477.)  Her condition was described as "not changed" from previous visits.  (*Id*.)

On February 17, 2016, Snead received counseling at Care Alliance.  (*Id*. at 473.)  Her symptoms included anhedonia, anxiety, depressed mood, feelings of worthlessness and guilt, tearfulness, avoidance, flashbacks, increased startle, and intrusive memories.  (*Id*.)  Her condition was described as "not changed" from previous visits.  (*Id*.)

On February 24, 2016, Snead received counseling at Care Alliance.  (*Id*. at 468.)  Her symptoms included anhedonia, anxiety,  depressed mood, difficulty concentrating, fatigue, feelings of worthlessness and guilt, irritability, avoidance, flashbacks, hyper vigilance, and intrusive memories. (*Id*.)  Her counselor assisted her is completing a paratransit application to enable a friend to accompany her on public transportation.  (*Id*. at 469.)  Her condition was described as "not changed" from previous visits.  (*Id*.)

On March 24, 2016, Snead received counseling at Care Alliance. (*Id*. at 467.) Her symptoms included anhedonia, depressed  mood, difficulty concentrating, fatigue, hypersomnia, irritability, obsessive thoughts, and uncontrolled worry.  (*Id*.)  Her condition was described as "not changed" from previous visits.  (*Id*.)

On April 15, 2016, Snead received counseling at Care Alliance.  (*Id*. at 465.) Her symptoms included depressed mood, difficulty concentrating, fatigue, irritability and restlessness.  (*Id*.)  Her condition was described as "not changed" from previous visits.  (*Id*.)

On May 23, 2016, Snead received counseling at Care Alliance.  (*Id*. at 461.) Her symptoms included anxiety, depressed mood, difficulty concentrating, fatigue, feelings of worthlessness and

guilt, and hopelessness.  (*Id*.)  Her condition was described as "not changed" from previous visits. (*Id*.)

On June 16, 2016, Snead received counseling at Care Alliance.  (*Id*. at 460.)  Her symptoms included depressed mood, difficulty concentrating, feelings of worthlessness and guilt, hopelessness, tearfulness, decreased concentration, obsessive thoughts, and uncontrolled worry.  (*Id*.)  Her condition was described as "worsened" from previous visits.  (*Id*.)

On June 23, 2016, Snead received counseling at Care Alliance.  (*Id*. at 455.)  Her symptoms included depressed mood, fatigue, feelings of worthlessness and guilt, irritability, tearfulness, avoidance, flashbacks, hyper vigilance increased startle, and intrusive memories. (*Id*.) Her condition was described as "not changed" from previous visits.  (*Id*.)

On July 29, 2016, Snead received counseling at Care Alliance.  (*Id*. at 450.)  Her symptoms included depressed mood, difficulty concentrating, fatigue, feelings of worthlessness and guilt, tearfulness, avoidance, flashbacks, hyper vigilance increased startle, and intrusive memories.  (*Id*. at 451.)  Her father had passed away earlier in the month.  (*Id*.)  Her condition was described as "not changed" from previous visits.  (*Id*.)

On August 19, 2016, Snead received counseling at Care Alliance.  (*Id*. at 449.)  Her symptoms included anxiety and depressed mood.  (*Id*.)  Her condition was described as "not changed" from previous visits.  (*Id*.)

On August 26, 2016, Snead received counseling at Care Alliance.  (*Id*. at 447.)  Her symptoms included depressed mood, restlessness and difficulty concentrating. (*Id*.) Her condition was described as "not changed" from previous visits.  (*Id*. at 448.)

On September 1, 2016, Snead received counseling at Care Alliance.  (*Id*. at 444.)  Her

5

symptoms included depressed mood and feelings of worthlessness and guilt.  (*Id*.)  Her condition was described as "not changed" from previous visits.  (*Id*.)

On September 19, 2016, Snead received counseling at Care Alliance.  (*Id*. at 442.)  Her symptoms included anxiety and depressed mood.  (*Id*.)  Her condition was described as "not changed" from previous visits.  (*Id*.)

On September 26, 2016, Snead received counseling at Care Alliance.  (*Id*. at 441.)  Her symptoms included depressed mood.  (*Id*.)  Her condition was described as "not changed" from previous visits.  (*Id*.)

On October 10, 2016, Snead received counseling at Care Alliance.  (*Id*. at 439.)  Her symptoms included anxiety, depressed mood, fatigue, feelings of worthlessness and guilt, tearfulness, decreased concentration, excessive fear, social anxiety, uncontrolled worry, avoidance, flashbacks, hyper arousal and hyper vigilance.  (*Id*.)  Her condition was described as "not changed" from previous visits.  (*Id*.)

On October 17, 2016, Snead received counseling at Care Alliance.  (*Id*. at 435.)  Her symptoms included anxiety, depressed mood, feelings of worthlessness and guilt and tearfulness.  (*Id*.)  Her condition was described as "not changed" from previous visits.  (*Id*.)

On November 1, 2016, Snead returned to FrontLine Service.  (*Id*. at 517.)  Her depression symptoms were identified as dysphoria, weight loss or gain, anhedonia, irritability, fatigue, hopelessness, decreased concentration, worthlessness, increased or decreased sleep, and suicidal ideation as recently as one month prior.  (*Id*. at 517-18.)  She also reported experiencing panic attacks.  (*Id*. at 517.)

On November 18, 2016, Snead received counseling at Care Alliance.  (*Id*. at 433.)  Her

6

symptoms included depressed mood, difficulty concentrating, fatigue, feelings of worthlessness and guilt, tearfulness, decreased concentration, irritability, muscle tension, and obsessive thoughts. (*Id.* at 434.)  She had been off her psychiatric medications for an unknown amount of time, and her condition was described as "worsened" from previous visits.  (*Id.*)

On December 2, 2016, Snead returned to Care Alliance for counseling.  (*Id.* at 429.)  Her symptoms included anxiety, depressed mood, and tearfulness.  (*Id.*)  She had recently moved into her own apartment in supportive housing and was feeling lonely.  (*Id.*)  Her condition was described as "unchanged" from previous visits.  (*Id.*)

On January 12, 2017, Snead returned to Care Alliance for counseling.  (*Id.* at 419.)  Her symptoms included anxiety, depressed mood, irritability and tearfulness.  (*Id.*)  Her condition was described as "unchanged" from previous visits.  (*Id.*)

On February 17, 2017, Snead received counseling at Care Alliance.  (*Id.* at 420.)  Her symptoms included depressed mood and irritability.  (*Id.*)  Her counselor encouraged her to speak with the caseworker in her building to "get linked to Supported Employment for assistance with finding something suitable for pt's abilities."  (*Id.* at 421.)  Her condition was described as "unchanged" from previous visits.  (*Id.*)

On March 2, 2017, Snead returned to Care Alliance for counseling.  (*Id.* at 419.)  Her symptoms included depressed mood, hypersomnia and tearfulness.  (*Id.*)  Her condition was described as "unchanged" from previous visits.  (*Id.*)  She reported having run out of her psychiatric medication, and missing her scheduled psychiatry appointment because her case manager hadn't picked her up.  (*Id.*)

On March 6, 2017, Dr. Neal Goldenberg, a psychiatrist at FrontLine Service, completed a

mental status questionnaire after meeting Snead only once.  (*Id*. at 598.)  He described Snead as overweight, with a malodorous, disheveled appearance, a depressed mood, and a "bright, friendly, reactive" affect.  (*Id*.)  He noted her cognitive function was "grossly normal," but her "insight regarding the dire condition of her physical health is minimal." (*Id*.)  He noted Snead spoke rapidly; and was somewhat overly inclusive of details.  (*Id*.)  Dr. Goldenberg observed no signs or symptoms of anxiety, and no thinking disorders.  (*Id*.)  He opined that Snead had normal ability to remember, understand and follow directions, maintain attention, and sustain concentration, persist at tasks and complete them in a timely fashion.  (*Id*. at 599.)

On March 13, 2017, Snead completed a Function Report. (*Id*. at 269-76.) She reported that she had scoliosis and kyphosis of the spine which caused back pain and she had breathing problems including asthma and bronchitis, diabetes, high cholesterol, high blood pressure, anxiety, and PTSD. (*Id*. at 269.)  She had nightmares of her past and was up every hour or two.  (*Id*. at 270.) She rarely left her house, but would shop once or twice a month and after a half-hour would feel anxiety or chronic pain.  (*Id*. at 272.)  She had a hard time understanding things and staying focused.  (*Id*. at 273.)  She became very aggravated and irritated around large groups.  (*Id*. at 274.)

At follow up visits in April and May 2017, Dr. Goldenberg noted that Snead had normal motor activity and speech, average demeanor/attitude, depressed mood, full and constricted affect, average intelligence, organized thought process, full insight, mildly impaired and intact judgment, no cognitive impairment and cooperative behavior.  (*Id*. at 532-33, 536-37).  He prescribed medication and referred Snead to therapy.  (*Id*. at 534, 538).

On June 3, 2018, Jennifer Boryczka completed a Function Report.  (*Id*. at 325-32.) Boryczka described herself as Snead's best friend of twenty-eight years and stated she saw Snead three or four

8

days a week.  (*Id*. at 325.)  Boryczka noted that because of Snead's " anxiety and depression she does not go anywhere unless she has someone she trusts with her."  (*Id*. at 325.)  She reported that Snead needed reminders to test her sugar, take her medications, perform personal care like bathing and doing laundry, and sometimes needed reminders to eat.  (*Id*. at 327.)  Snead also had "trouble with getting to do housework due to major depression, anxiety, PTSD, trust issues."  (*Id*.)  She opined that Snead would "do okay" at following written instructions, but "needs step by step written instructions" due to forgetting.  (*Id*. at 330.)  She opined Snead would not do well with spoken instructions because of her learning disabilities and comprehension problems.  (*Id*.)  She noted that Snead "can't concentrate on any one thing for very long."  (*Id*.)

Dr. Goldenberg completed a second assessment on July 2, 2018.  (*Id*. at 1308-09.)  He reported treating Snead for major depressive disorder and PTSD monthly for approximately two years.[3]  (*Id*. at 1308.)  Dr. Goldenberg opined that Snead would have the following limitations as a result of her mental and emotional impairments:

- could not perform at a consistent pace without an unreasonable number and length of rest periods;

- would be unable to meet competitive standards for working in coordination with or proximity to others without being distracted by them;

- would be unable to complete a normal workday or workweek without interruptions from psychologically-based symptoms;

- would be seriously limited in understanding and remembering detailed instructions, interacting appropriately with the general public, and asking simple questions or requesting assistance;

- would be unable to accept instructions and respond appropriately to criticism from

---

[3]  Because Dr. Goldenberg's prior assessment identified March 6, 2017, as the date he began treating her, it appears he had been treating her for 16 months.  (Tr. 598.)

supervisors or get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

- would be unable to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness;

- would be unable to respond appropriately to changes in the work setting; and

-  would miss two days of work per week and be off task fifty percent of a day.

(*Id*. at 1308-09.)  He based these opinions on clinical finding including low frustration tolerance, chronic depressive distortions, highly anxious, and self-doubting behavior.  (*Id*. at 1308.)

## 2. Physical Impairments

On June 10, 2016, Snead was treated at MedCare Group, Inc., for extreme pain in her back. (*Id*. at 341.) She was 4 feet 9 inches tall and weighed three hundred seventy pounds.  (*Id*. at 342.) Snead was assessed with diabetes, central sleep apnea, congenital malformation syndromes predominantly associated with short stature, and low back pain.  (*Id*. at 343.)

On September 16, 2016, she returned to MedCare Group for a follow-up visit, reporting "she feels well but still has a lot of back pain."  (*Id*. at 345.)  Her diabetes was noted to be "uncontrolled," and she had lost two pounds.  (*Id*. at 346.)

On November 5, 2016, she returned to MedCare Group, again stating that "she feels well but has a lot of back pain," as well as reporting a change in her appetite and decreased energy.  (*Id*. at at 351, 353.)

On December 8, 2016, Snead returned to MedCare Group for medication refills.  (*Id*. at 358.) She reported "she feels well but has some tingling and numbness in both feet and toes. . . Also has the lower back pain."  (*Id*. at 359.)  She weighed three hundred seventy-three pounds (Tr. 358-60.)

10

On February 20, 2017, Snead returned to MedCare Group, seeking treatment of daily lower back and knee pain.  (*Id*. at 364.)  On examination, she weighed three hundred eighty-one pounds (*Id*. at 365.)

On March 13, 2017, Snead completed a Function Report. (*Id*. at 269-76.) She reported that she had scoliosis and kyphosis of the spine which caused back pain and she had breathing problems including asthma and bronchitis, diabetes, high cholesterol, high blood pressure, anxiety, and PTSD. (*Id*. at 269). She rarely left the house, but would shop once or twice a month and after a half-hour would feel anxiety or chronic pain.  (*Id*. at 270-72.)

 On April 17, 2017,  Dr. Robin Benis conducted a consultative examination.   (*Id*. at 551-555.) Snead weighed three hundred eighty-four pounds.  (*Id*. at 552.)  She could not walk on her heels or toes or squat, and was not able to get on the exam table.  (*Id*. at 553.)  Dr. Benis diagnosed Snead with morbid obesity, sleep apnea, scoliosis and kyphosis of the thoracic spine, asthma, diabetes, hypertension, and hypercholesterolemia.  (*Id*. at 554.)  She opined that Snead had moderate limitations with standing, walking, and going up and down stairs, and should not be exposed to smoke or dust.  (*Id*.)

On June 7, 2017, Snead returned to MedCare Group seeking help for nerve pain in both her feet.  (*Id*. at 383.)  She reported gabapentin was not working.  (*Id*.)  On examination, she weighed 370 pounds.  (*Id*. at 384.)

On June 13, 2017, Snead had a CPAP/Bi-level report with an overnight polysomnogram. (*Id*. at 691-701.)  She was diagnosed with severe obstructive sleep with a BiPAP and had symptoms of sleep apnea.  (*Id*. at 702.)

On June 24, 2017, Dr. Lance Wilson treated Snead at MetroHealth for diffuse right-sided

11

pain which radiated to her right abdomen and back and left shoulder pain.  (*Id*. at 391.)  Dr. Wilson noted that she had no acute cardiopulmonary process but had chest pain and pleurisy.  (*Id*. at 393-94.)

From April 2 through April 6, 2018, Snead was hospitalized at the Cleveland Clinic Lutheran Hospital for treatment of cellulitis of her abdominal wall.  (*Id*. at 736-37.) Records note her other active problems included diabetic polyneuropathy, benign essential hypertension, major depressive disorder, mild intermittent asthma, morbid obesity, obstructive sleep apnea, tobacco abuse, and nicotine use disorder.  (*Id*. at 738.)

On April 16, 2018, April 23, 2018, May 2, 2018, and May 9, 2018, Snead had debridement of her lower abdominal wound.  (*Id*. at 959, 960, 961, 1018.)

On May 16 and 23, 2018, Snead's Cleveland Clinic physician, Dr. Emad Elbadawy, noted that an abdominal ulcer related to an abscess was slowly healing.  (*Id*. at 1026, 1029.)

On May 18, 2018, Snead returned to MedCare Group for medication refills.  (*Id*. at 1033.) Over the past month, she had lost 23 pounds, and now weighed 320 pounds.  (*Id*. at 1034.)  On the same date, an x-ray of Snead's back revealed mild to moderate levodextro-levoscoliosis of the thoracic and lumbar spine, an increased in the thoracolumbar kyphosis and flattening of the thoracic kyphosis, and transitional lumbar anatomy.  (*Id*. at 1445.)

On June 3, 2018, Jennifer Boryczka completed a Function Report.  (*Id*. at 325-32.) Boryczka described herself as Snead's friend of twenty-eight years, who visited Snead three or four times a week,  and noted that Snead "has a physical disability which made it hard for her to bathe herself and do other daily tasks such as cooking, cleaning, shopping, etc." (*Id*. at 325.)  She reported Snead had severe sleep apnea and stopped breathing at night.  (*Id*. at 326.)  She explained that Snead's mobility

was limited by pain, so she could not lift, squat, bend, or stand too long, could barely climb stairs, and "has to take breaks from walking due to pain in back and legs and shortness of breath."  (*Id*. at 330.)  She also noted that her friend "is very off balance," and had difficulty getting up when she fell.  (*Id*. at 332.)

On June 22, 2018, Snead was examined by Dr. Wassin El-Hitti for an acute kidney injury, resulting from her use of NSAID medications and diuretics.  (*Id*. at 1293.)  Dr. El-Sitti noted the injury was "resolving" and advised Snead to continue to avoid use of NSAIDs.  (*Id*. at 1294.)

**C.     State Agency Reports**

**1.     Mental Impairments**

In April 2017, Irma Johnston, Psy.D., state agency reviewing psychologist, reviewed the record evidence and opined that Snead had mild limitations in understanding, remembering or applying information and interacting with others; moderate limitations in concentrating, persisting, or maintaining pace and adapting or managing oneself; and could perform simple, routine tasks with simple, short instructions; make simple decisions in a setting with few workplace changes; and could not work in a fast-paced production quota environment.  (*Id*. at 129, 131-32).

In July 2017, state agency reviewing psychologist Vicki Warren, Ph.D., affirmed Dr. Johnston's assessment.  (*Id*. at. 143-44, 146.)  Both state agency psychologists adopted the prior ALJ's limitations.  (*Id*. at 132, 146.)

**2.     Physical Impairments**

On April 24, 2017, state agency reviewing physician Dr. Dmitri Teague reviewed the file and opined that Snead was limited to the sedentary level of exertion except she could:

•        lift and carry 10 pounds occasionally;

- stand and/or walk for 2 hours out of an 8-hour workday;

- sit for 6 hours out of an 8-hour workday;

- occasionally climb ramps and stairs, but would be precluded from climbing ladders, ropes, and scaffolds;

- occasionally stoop, balance, kneel, crouch, and crawl;

- reach in all directions;

- handle, finger, and feel; and

- should not have exposure to extreme temperatures, humidity, or concentrated levels of pulmonary irritants such as fumes, dusts, odors, and gases.

(*Id*. at 131.)

In June 2017, state agency reviewing physician Dr. Theresa Cruz adopted the March 2016 residual functional capacity ("RFC") determination of the prior ALJ, which had the same limitations as Dr. Teague's April 2017 assessment. (*Id*. at 145-46.)

**D.     Hearing Testimony**

During the July 19, 2018  hearing, Snead testified to the following:

- She is 35 years old and has a 12th grade education.  (*Id*. at 39.)

- She last worked about ten years ago, as a fast cashier and food preparer.  She quit because she "couldn't handle it no more."  (*Id*. at 39-40.)

- She now lives alone in an apartment.  She receives housing assistance and food stamps.  (*Id*. at 40.)

- Jennifer Boryczka has been her best friend since she was six years old.  (*Id*. at 40-41.)

- She is still attending her medical appointments regularly.  Her caseworker comes to pick her up.  (*Id*. at 41.)

- She feels that her anxiety is what limits her ability to work the most.  She cries every day, has trouble talking to people, and shuts down.  (*Id*. at 42.)

14

- Her depression causes her to have trouble sleeping.  She wakes every two hours. Her body is tired, but her mind won't stop racing.  (*Id*. at 43.)

- Three or four days a week, she doesn't want to do anything, and will spend the whole day on the couch or the bed.  (*Id*. at 44.)

- A nurse comes to her home daily to clean and treat her ulcer.  (*Id*. at 45-46.)

The VE testified Snead had past work as a fast food worker.  (*Id*. at 49.)  The ALJ then posed the following hypothetical question:

> [T]o use the . . . the hypothetical from the prior decision . . . this individual is able to perform sedentary work as defined by the regulations, only occasional climbing of ramps and stairs, no climbing of ladders, ropes or scaffolds, occasional stooping, balancing, kneeling, crouching and crawling, could reach in all directions, no exposure to extreme temperatures, humidity or pulmonary irritants, able to perform simple tasks, following simple instructions, but not work in a fast-paced production quota environment and lastly, few, if any, workplace changes.

(*Id*. at 49-50.)

The VE testified the hypothetical individual would not be able to perform Snead's past work as a fast food worker.  (*Id*. at 50.)  The VE further explained the hypothetical individual would be able to perform other representative jobs in the economy, such as food and beverage clerk, charge account clerk, or document preparer.  (*Id*.)

The ALJ asked a second hypothetical question adding the limitation that the hypothetical individual would be off task at least twenty percent of the workday or would miss or be unable to complete two or more workdays per month.  (*Id*. at 50.)  The VE testified there would be no jobs for such a person.  (*Id*.)

Counsel for Snead asked the VE to clarify that reasoning level two "has a person carry out details, but uninvolved written and oral instructions." (*Id*. at 51.)  The VE agreed that was the definition, and explained that all jobs had an SVP and reasoning level requirement.  (*Id*.)  The SVP

refers strictly to the amount of time it took to learn a job. (*Id*. at 52.)

### III.     STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.   20 C.F.R.  §§  404.1520(c)  and  416.920(c).   A  "severe  impairment"  is  one  that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that  is  expected  to  last  for  at  least  twelve  months,  and  the  impairment,  or  combination  of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and  416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g),

404.1560(c), and 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant has not engaged in substantial gainful activity since February 28, 2017, the application date.

2.      The claimant has the following severe impairments: scoliosis and kyphosis of the spine; diabetes mellitus; obstructive sleep apnea (OSA); obesity; a learning disorder; a major depressive disorder; and a posttraumatic stress disorder.

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(a) and 416.967(b) except the claimant could lift and carry 10 pounds occasionally.  She could stand and/or walk for 2 hours out of an 8-hour workday and could sit for 6 hours out of an 8-hour workday. She could occasionally climb ramps and stairs, but would be precluded from climbing ladders, ropes, and scaffolds.  She could occasionally stoop, balance, crouch, and crawl.  The claimant could reach in all directions, handle, finger, and feel.  She should not have exposure to extreme temperatures, humidity, or concentrated levels of pulmonary irritants such as fumes, dusts, odors, and gases.  The claimant could perform simple, routine tasks with simple, short instructions.  She could make decisions in a setting with few workplace changes.  Further, the claimant could not work in a fast-paced production quota environment.

5.      The claimant is unable to perform any past relevant work.

6.      The claimant was born on May **, 1983 and was 33 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7.      The claimant has at least a high school education and is able to communicate in English.

8.      Transferability of job skills is not an issue because the claimants past relevant work is unskilled.

17

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.     The claimant has not been under a disability, as defined in the Social Security Act, since February 28, 2017, the date the application was filed.

(Tr. 18-27) (internal citations omitted).

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388,

18

389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11–13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10–cv–734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10–CV–017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09–cv–1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI. ANALYSIS

**A.**     **First Assignment of Error:  The ALJ failed to properly apply the doctrine of *res judicata* when he found that the earlier decision of the ALJ in Snead's prior application was binding and that there had not been any new or material change**.

Snead asserts that the current ALJ ( the "ALJ") improperly adopted the RFC determination of the prior ALJ  (the "Prior ALJ"), did not follow the principles of *res judicata* with respect to that prior decision, and failed to determine whether there was new and material evidence to alter the prior ALJ's findings.  (Doc. No. 11 at 12-14.)

The Commissioner responds that ALJ did not commit reversible error in his consideration of the Prior ALJ's decision and relevant evidence.  (Doc. No. 13 at 10.)  The Commissioner asserts that ALJ considered the Prior ALJ's decision and determined that the record did not contain new and material evidence to warrant a departure from the functional limitations imposed by the Prior ALJ.  (*Id*.)  Therefore, he argues, the ALJ properly adopted the same limitations as the Prior ALJ.  (*Id*.)

## 1.     Application of the doctrine of *res judicata*

In *Drummond v. Commissioner of Social Security*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond*, 126 F.3d 837, 842 (6th Cir. 1997) (relying on *Senters v. Sec'y of Health & Human Servs*., No. 91-5966, 1992 WL 78102 (6th Cir. Apr. 17, 1991) (per curiam).  *See also Dennard v. Sec'y of Health & Human Servs*., 907 F.2d 598 (6th Cir. 1990) (per curiam); *Blankenship v. Comm'r of Soc. Sec.*, 624 F. App'x 419, 425 (6th Cir. Aug. 26, 2015).  In that case, Drummond's initial claim for SSI was denied when an ALJ found that Drummond retained a RFC for sedentary work.  *Drummond*, 126 F.3d. at 838. When Drummond later re-filed her disability claim, a second ALJ found that Drummond retained

a RFC suitable for medium-level work—unlike the sedentary RFC finding of the first ALJ—and denied the re-filed claim. *Id.* at 839. After explaining that "*[r]es judicata* applies in an administrative law context following a trial type hearing," the Sixth Circuit held that the second ALJ was bound to the sedentary RFC determination of the first ALJ because there was no new or additional evidence of an improvement in Drummond's condition. *Id.* at 841–842. "Just as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner." *Id.*

       In response to *Drummond*, the Social Security Administration promulgated Acquiescence Ruling 98–4(6). The Administration explained:

> This Ruling applies only to disability findings in cases involving claimants who reside in Kentucky, Michigan, Ohio, or Tennessee at the time of the determination or decision on the subsequent claim at the initial, reconsideration, ALJ hearing or Appeals Council level. It applies only to a finding of a claimant's residual functional capacity or other finding required at a step in the sequential evaluation process for determining disability provided under 20 CFR 404.1520, 416.920 or 416.924, as appropriate, which was made in a final decision by an ALJ or the Appeals Council on a prior disability claim.
>
> **When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding** or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98–4(6) (S.S.A.), 1998 WL 283902, at *3 (1998) (emphasis added) (footnote omitted).

       The Sixth Circuit clarified the scope of *Drummond* and its progeny in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. June 27, 2018). In *Earley*, the Sixth Circuit clarified *res judicata* applies to subsequent applications for "the same period of time [] rejected by the first application." *Id.* at 933. The Sixth Circuit further reasoned:

> While we are at it, we should point out that issue preclusion, sometimes called collateral estoppel, rarely would apply in this setting.  That doctrine "foreclos[es] successive litigation of an issue of fact or law actually litigated and resolved."  *Id*. at 748-49, 121 S.Ct. 1808.  But human health is rarely static.  Sure as we're born, we age.  Sometimes we become sick and sometimes we become better as time passes.  Any earlier proceeding that found or rejected the onset of a disability could rarely, if ever, have "actually litigated and resolved" whether a person was disabled at some later date.
>
> All of this helps to explain why *Drummond* referred to "principles of *res judicata*" – with an accent on the word "principles."  126 F.3d at 841-843.  What are those principles?  Finality, efficiency, and the consistent treatment of like cases.  An administrative law judge honors those principles by considering what an earlier judge found with respect to a later application and by considering that earlier record.  *Id*. at 842, *see Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 478 (4th Cir. 1999).  This is why it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are legitimate, albeit not binding, consideration in reviewing a second application.

*Earley*, 893 F.3d at 933.

Here, Snead filed earlier applications for a Period of Disability, Disability Insurance Benefits and SSI on September 23, 2013.  (Tr. 98.)  A hearing was held in her appeal of that case on January 14, 2016.  (*Id*. at 56-94.)  On March 2, 2016, the Prior ALJ issued an unfavorable decision in that case. (*Id*. at 95-122.)  On September 23, 2016, the Appeals Council declined further review, making the Prior ALJ's decision final for the adjudicated period.  (*Id*. at 248.)

It is undisputed that the application at issue in this case covers a different period.  The current application for SSI was filed on March 1, 2017, and the adjudicated period therefore begins on that date.[4]  Under *Early*, this means the Prior ALJ's findings are entitled to " legitimate, albeit not binding, consideration in reviewing a second application."  *Earley*, 893 F.3d at 933.

---

[4]  Regardless of the actual or alleged onset date of disability, an SSI claimant is not entitled to SSI benefits prior to the date the claimant files an SSI application. *See* 20 C.F.R. § 416.335.

22

In his decision, the ALJ addressed this issue as follows:

> Both State agency medical consultants and both State agency psychological consultants adopted the residual function capacity found by the prior Administrative Law Judge. In considering *Drummond* and AR 98-4(6), the undersigned gives great weight to the State agency opinions and adopts the prior Administrative Law Judge's residual functional capacity finding. The undersigned finds that no new and material evidence exists pertaining to the current period of adjudication that would provide a basis for finding a different residual functional capacity. For instance, the claimant mostly exhibited normal gait, strength, range of motion, and neurological findings during the relevant period. While mental status examinations show some abnormal findings, the evidence of the record during the period at issue does not demonstrate greater limitations than previously found.

(Tr. 25) (internal citations omitted). The ALJ did not cite *Earley,* although it is applicable. However, the ALJ did follow the precepts set out in *Earley*: he did not give the earlier decision controlling weight, or state that he believed *res judicata* applies to bind the current decision to follow the prior determination. Instead, he gave the Prior ALJ's decision "great weight," based on his determination that there is no "new and material evidence," language which closely mirrors *Earley's* admonition that without such evidence "the first administrative law judge's findings are legitimate, albeit not binding, consideration in reviewing a second application." *Earley*, 893 F.3d at 933.

Accordingly, the Court finds that the ALJ did not misapply the principles of *res judicata*, as Snead alleges.

### 2.    The determination that there is no new and material evidence

The next issue is whether the ALJ properly determined that there was no new and material evidence in the record. Here, Snead challenges the ALJ's finding that she "is limited; however, the medical evidence and other evidence does not demonstrate a further degree of loss of functioning." She asserts that, although the state agency reviewers considering the current application adopted the findings of their predecessors, it is unclear in the record whether the prior reviewers shared the

current reviewers' belief that Snead "will have difficulty" with many tasks. (Doc. No. 11 at 13.) Further, she argues that new and material evidence was presented in both the medical records and Snead's hearing testimony relating to the change in her diabetes and obesity which resulted in the cellulitis/ulcer/abscess of her abdomen. (*Id*.) Snead also argues the ALJ improperly relied on the opinion of the state agency reviewing physicians because they all reviewed the record prior to Snead's hospitalization for treatment of her ulcer. However, it is proper for an ALJ to credit a state agency consultant's opinion when it is "supported by the totality of evidence in the record, and the ALJ considered the evidence obtained after the consultant issued his opinion." *Myland v. Comm'r of Soc. Sec.*, 2017 WL 5632842 at *2 (6th Cir. Nov. 13, 2017). *See also Ruby v. Colvin*, 2015 WL 1000672 at *4 (S.D. Ohio Mar. 5, 2015) ("[S]o long as an ALJ considers additional evidence occurring after a state agency physician's opinion, he has not abused his discretion."); *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence developed post-dating those opinions).

The ALJ's decision demonstrates he considered the entire record. This element of the first assignment of error mirrors the second subpart of Snead's second assignment of error, where she argues that the ALJ did not properly consider the impact of Snead's obesity and diabetes in combination with her other impairments and properly assessed their impact on her ability to work. (Doc. No. 11 at 14-15.) The core of Snead's argument is that the cellulitis was new and material evidence demonstrating a change in both Snead's diabetes and obesity, because these long term conditions "resulted in" the cellulitis. (*Id*. at 13.)

As discussed at greater length in section VI.B.2 below, the ALJ determined that Snead's

24

abdominal wall cellulitis did not meet the 12-month durational requirement to qualify as a disability under the regulations.  Snead points to no evidence that a more through analysis of the interrelation between her obesity, diabetes and cellulitis would have changed the ALJ's conclusion on this issue.  Nor does she cite any evidence showing that the cellulitis was indicative of a change in either her diabetes or obesity.  Further, at the time of her hearing before the Prior ALJ, on January 14, 2016, Snead testified that she weighed 358 pounds.  (Tr. 103.)  Six months later, on June 10, 2016, treatment records from MedCare Group show she weighed 370 pounds.  (*Id*. at 342.)   By May 18, 2018, MedCare Group records documenting the treatment of her cellulitis also show that Snead weighed 320 pounds.  (*Id*. at 1034.)  Therefore, the ALJ had good reason not to determine that Snead's cellulitis was caused by a worsening of her obesity, since it continued to require treatment even after she lost a significant amount of weight.  It is the responsibility of the claimant to present evidence establishing her impairments, and here Snead has not provided evidence showing a link between her abdominal wall cellulitis and the claimed change in her severe impairments of obesity and diabetes.  Therefore, the ALJ properly determined that abdominal wall cellulitis, while a new impairment, was of less than twelve months' duration and therefore not material to the claim.

**B.**     **Second Assignment of Error: The ALJ failed to properly evaluate the evidence and give controlling weight to the opinions of the treating psychiatrist in violation of 20 C.F.R. § 416.927 along with failing to properly consider Social Security Rulings 02-1p and 14-2p.**

Next, Snead asserts that the ALJ improperly discounted the weight given to the opinion of Snead's treating psychiatrist, Dr. Goldenberg. (Doc. No. 11 at 14.)  She further asserts the ALJ erred by giving great weight to the opinions of the state agency reviewing physicians, who reviewed the record prior to her hospitalization for treatment of an abscess, and thus did consider those records.  (*Id*.)  Finally, she again asserts that the ALJ erred by failing to consider the combination of her

cellulitis, ulcer, and abscess in conjunction with her obesity and diabetes as required by SSR 14-2p. (*Id*. at 19.)

The Commissioner responds that the ALJ reasonably weighed Dr. Goldenberg's opinion, and properly considered the impact of Snead's obesity and diabetes in combination with her other impairments and properly assessed their impact on her ability to work. (Doc. No. 13 at 11, 14-15.) He asserts that the ALJ reasonably considered the opinion evidence, reviewed the record evidence as a whole and made an RFC determination that reasonably accommodated Snead's work-related limitations resulting from her impairments. (*Id*.)

### 1.    The Opinion of the Treating Psychiatrist

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[5] However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[6] *See also Gayheart*, 710

---

[5]    Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017). This claim was filed on March 1, 2017, and the Court applies the regulations in effect as of that date.

[6]    Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the

F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id*., as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reason' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 242 (6th Cir. 2007).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence,

---

relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

27

even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. Moreover, the "treating physician rule" only applies to *medical opinions*.  "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'" *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 505 (6th Cir. 2013).  The opinion, however, "is not entitled to any particular weight." *Turner*, 381 F. App'x at 493.  *See also Curler v. Comm'r of Soc. Sec.,* 561 F. App'x 464, 471 (6th Cir. 2014).

As noted *supra*, Dr. Goldenberg completed two assessments of Snead.  The first assessment was completed on March 9, 2017, after a single visit.  (Tr. 598-99.)  Snead makes no objection to the ALJ's handing of this first opinion.  The second assessment is dated July 2, 2018, at which time Dr. Goldenberg reported treating Snead for major depressive disorder and PTSD monthly for approximately two years.[7]  (*Id*. at 1308.)  It is undisputed that, at the time of the second opinion, Dr. Goldenberg qualified as a treating source.  Dr. Goldenberg's second opinion stated that Snead would have the following limitations as a result of her mental and emotional impairments:

•    could not perform at a consistent pace without an unreasonable number and length

---

[7]    As previously noted, Dr. Goldenberg's prior assessment identified March 6, 2017, as the date he began treating her, so he had been treating her for 16 months.  (Tr. 598.)  It is undisputed that he was a treating source at this time.

of rest periods;

- would be unable to meet competitive standards for working in coordination with or proximity to others without being distracted by them;

- would be unable to complete a normal workday or workweek without interruptions from psychologically-based symptoms;

- would be seriously limited in understanding and remembering detailed instructions, interacting appropriately with the general public, and asking simple questions or requesting assistance;

- would be unable to accept instructions and respond appropriately to criticism from supervisors or get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

- would be unable to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness;

- would be unable to respond appropriately to changes in the work setting; and

-  would miss two days of work per week and be off task fifty percent of a day.

(*Id*. at 1308-09.)  He based these opinions on clinical finding including low frustration tolerance, chronic depressive distortions, highly anxious, and self-doubting behavior.   (*Id*. at 1308.)

The ALJ addressed Dr. Goldenberg's opinion as follows:

As for the opinion evidence, the undersigned gives little weight to the opinion of treating source Neil Goldenberg, M.D.  Dr. Goldenberg opined that the claimant is seriously limited and unable to meet competitive standards in most mental functioning areas due to her mental conditions.  He further opined that claimant would miss two days per week and be off-task for 50 percent of a workday.  This opinion is inconsistent with the record.  While mental status examinations noted she appeared depressed and irritable at times, her treatment provider indicated she has no cognitive impairment.  She consistently denied experiencing memory issues.  In addition, during the period at issue, the claimant did not require emergency treatment or inpatient care due to her mental health symptoms.  Accordingly, the evidence does not support Dr. Goldenberg's opinion, and the undersigned gives it little weight.

The undersigned gives little weight to Dr. Goldenberg's earlier opinion on March 9, 2017.  Dr. Goldenberg opined the claimant has having [sic] normal ability to

29

remember, understand and follow instructions, maintain attention, and sustain concentration. However, at that time, Dr. Goldenberg had treated the claimant on only one occasion. Therefore, the undersigned gives the opinion little weight.

(Tr. 24) (internal citations omitted).

The ALJ's explanation of his treatment of Dr. Goldenberg's opinion is insufficient as it relates to the opined limitations regarding interaction with colleagues and the general public. Earlier in the decision, the ALJ noted that Snead "often appeared depressed, anxious, and at times irritable," in the treatment records. (*Id*.) Snead testified that she believes anxiety is the mental health impairment that limits her the most. (*Id*. at 42.) However, the ALJ does not acknowledge that Snead's anxiety is relevant to Dr. Goldenberg's opinion, although the social functioning limitations Dr. Goldenberg recognized are rooted in her distrust and avoidance of others. For example:

- Snead testified that she keeps to herself in her apartment, and socializes only with a trusted friend and family members. (*Id*. at 40.)

- Contrary to the ALJ's assertions that she can independently "schedule and attend medical appointments" and "navigate public transportation," she testified that a case worker picked her up for most of her medical appointments, and she was so anxious when taking the bus alone that she required a paratransit pass that allowed a companion to accompany her. (*Id*. at 24, 41.)

- The medical treatment records also reflect the need for accompaniment on public transportation. (*Id*. at 615, 630.)

- If her case manager did not pick her up, Snead missed her medical appointments. (*Id*. at 419.)

- Multiple case management records document Snead's need for assistance with going to the pharmacy to refill her prescriptions, and attending medical appointments.[8] (*Id*. at 1051, 1052, 1057, 1058, 1062, 1063, 1065, 1066, 1206,

---

[8] The treatment notes repeatedly state this directly, for example: "Client's [mental health symptoms] impact client's ability to maintain appointments and requires support from TBS," and "Client's [mental health symptoms] create barriers when managing physical health and requires assistance from CPST to manage." (Tr. 1051, 1052, 1057.) They also

1208, 1209.)

- At times, she ran out of medications because she failed to schedule or attend the appointments needed to renew them. (*Id*. at 419, 612.)

- Medical treatment records also document that Snead had recurring conflicts with neighbors, demonstrating her inability to manage social interactions with peers. (*Id*. at 1063, 1187, 1189, 1203.)

While the ALJ is not required to discuss every piece or record evidence, it is necessary that he acknowledge and address evidence that is contrary to his decision. Where, as here, an ALJ fails to acknowledge relevant evidence, "the Court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, 2012 WL 5383120, at *6. The ALJ's broad assertion that "the evidence does not support Dr. Goldenberg's opinion" is not sufficient in a case such as this one, where a significant amount of evidence does support the treating physician's opinion. The ALJ has identified evidence supporting his determination, but because he does not discuss the contradictory evidence, "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011).

In sum, the Court finds the ALJ's decision fails to set forth "good reasons" for discounting Dr. Goldenberg's second opinion. Accordingly, the Court recommends that a remand is necessary, thereby affording the ALJ the opportunity to sufficiently and more thoroughly address the mental functional limitations assessed by Dr. Goldenberg, with particular attention to the effect of Snead's anxiety on her social functioning.

### 2. The Consideration of Abdominal Wall Cellulitis in Conjunction with Diabetes

Snead takes issue with the ALJ's determination that her abdominal wall cellulitis was not

---

document the need for Snead's case manager had to take her to medical appointments. (*Id*. at 1062.)

a severe impairment, and asserts that the ALJ failed to consider this in the context of of SSR 14-2p,[9]

which deals with diabetes, and SSR 02-1p, which deals with obesity.  (Doc. No. 15-1 at 19-20.)  The

ALJ did determine that diabetes and obesity were a severe impairments, and explained his

determination that Snead's abdominal wall cellulitis was a non-severe impairment as follows:

> [I]n terms of the abdominal wall cellulitis, the wound first appeared in February 2018 when the claimant presented to the emergency department at MetroHealth System.  She was treated with antibiotics and discharged to following day.  However, the wound did not heal and on April 2, 2018, she was again admitted at Lutheran Hospital due to this condition.  Hospital staff treated her with intravenous antibiotics.  She was discharged several days later.
>
> Nevertheless, the wound did not properly heal.  Consequently, the claimant underwent several excisional debridement procedures in April and May 2018.  The record does not reflect additional inpatient treatment or procedures.  On May 21, 2018, the claimant reported improvement of her wound.
>
> On June 22, 2018, the claimant attended an appointment with Wassim El-Hini, M.D.  Dr. El-Hini examined the claimant and noted her skin appeared without suspicious lesions or rashes.  Moreover, he did not report abnormal findings on the claimant's abdomen.  In addition, she denied having abdominal pain.  At the time of the hearing,[10] the claimant testified a visiting nurse cleans and dresses the wound.  However, she testified the wound is now small.  Overall, the evidence does not demonstrate this condition is not healing and it does not meet the durational requirement to be a severe impairment.

(Tr. 18.)  The ALJ throughly reviewed the evidence relating to Snead's abdominal wall cellulitis.

He noted that it appeared to fully heal within four months.  (*Id*.)  Although he did not explicitly

connect it to her diabetes or obesity, he did identify both as severe impairments, and considered the

impact of all three conditions on her physical functional capacity.  (*Id*. at 23.)  He noted that her

medical providers frequently described her diabetes as being "without complications."  (*Id*.)  As

---

[9]  SSR 14-p(C) lists "Slow-healing bacterial and fungal infections" as one of the effects of diabetes.

[10]  The hearing was held on July 19, 2018.  (Tr. 16.)

discussed in section VI.A.2, *supra*, other medical record evidence established that Snead's obesity improved during this period.  The ALJ's explanation for finding Snead's abdominal wall cellulitis non-severe sets forth good reasons based on sufficient evidence, and Snead does not assert that he overlooked evidence suggesting this was a recurring or permanent impairment.  Therefore, the ALJ did not err in his treatment of Snead's abdominal wall abdominal wall cellulitis, diabetes, or obesity, either individually or in combination.

**C.      Third Assignment of Error: The ALJ failed to properly assess Plaintiff's subjective complaints**.

Third, Snead asserts that the ALJ's  assessment of her credibility was improper because his discussion contained "numerous contradictions" and "partial statements and findings," including that she was not precluded from completing activities of daily living despite her limitations.  (Doc. No. 8-1 at 23).

The Commissioner responds that the ALJ reasonably discounted Snead's subjective complaints because they were inconsistent with her activities, and contradicted by some of the objective medical evidence, medical opinion evidence, and Snead's treatment history.  (Doc. No. 13 at 18.)

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating these symptoms.  *See e.g, Massey v. Comm'r of Soc. Sec*., 2011 WL 383254 at *3 (6th Cir. Feb. 7, 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's]

capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p,[11] 2016 WL 1119029 (March 16, 2016).

If the claimant's allegations are not substantiated by the medical record, the ALJ must evaluate the individual's statements based on the entire case record.  The evaluation of a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs*., 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs*., 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms . . . and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p, 2016 WL 1119029; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  Beyond medical evidence, there are seven factors that the ALJ should consider.[12]  The

---

[11]  SSR 16-3p superceded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.

[12]  The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than

ALJ need not analyze all seven factors, but should show that he considered the relevant evidence.

*See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*,

406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

> The ALJ addressed Snead's subjective complaints as follows:
>
> The claimant's statements about the intensity, persistence, and limiting effects of her symptoms are somewhat consistent with the record in terms of her mental impairments. She continued to exhibit some abnormal signs including depressed mood and irritability at times. However, the claimant did not require emergency treatment or inpatient psychiatric care during the period at issue. She lives by herself and is able to do most personal care tasks and some household chores. The claimant is able to schedule and attend planned appointments. The evidence of record also establishes she is able to seek medical attention when needed. Accordingly, the undersigned accommodated the claimant's mental impairments by limiting her to simple, routine tasks with simple, short instructions, making simple decisions in a setting with few workplace changes and no fast-paced production quota environment.

(Tr. 25) (internal citations omitted).

As discussed *supra*, the ALJ's statements regarding Snead's activities of daily living are

inconsistent with the medical record evidence. Specifically, the record does not support the ALJ's

assertions that Snead had ability to independently schedule and attend planned appointments, and

seek medical attention when needed. Further, the ALJ entirely omits Snead's diagnosed anxiety

from his analysis, although Snead testified this was her most disabling mental impairment.

Therefore, the Court recommends that this assignment of error be sustained. On remand, the ALJ

should more thoroughly address the evidence supporting Snead's statements about the intensity,

persistence, and limiting effects of her mental health symptoms, with particular attention to the effect

---

treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029 at *7.

35

of Snead's anxiety on her social functioning.

**D.**      **Fourth Assignment of Error: The ALJ did not meet his burden at Step Five**

Snead's final assignment of error asserts that the ALJ did not meet his burden at Step Five of the sequential evaluation, where his is required to  provide "evidence about the existence of work in the national economy that [a claimant] can do given [his or her] residual functional capacity ... age, education, and work experience."  20 C.F.R. §416.920(g).  Snead asserts that the ALJ erred by relying on the VE's response to his first hypothetical, which restated the prior ALJ's determination of RFC.  (Doc. No. 15-1 at 24.)  She asserts that the ALJ should, instead, have relied on the VE's response to the second hypothetical, which added limitations that the hypothetical  person would be off task more than twenty percent of the workday or be unable to complete more than two days of work per month.  (*Id*.)

The Commissioner responds that this assignment of error is essentially identical to Snead's objections to the ALJ's determination of RFC, discussed *supra.*  (Doc. No. 9 at 20.)  He notes that the ALJ presented a hypothetical to the VE that was identical to her ultimate determination of RFC, and appropriately relied on the VE's response to that hypothetical question.  (*Id*.)

A hypothetical question must precisely and comprehensively set forth every physical and mental impairment that the ALJ accepts as true and significant.  *See Varley v. Sec'y of Health & Human Servs*., 820 F.2d 777, 779 (6th Cir. 1987).  Where the hypothetical question is supported by evidence in the record, it need not reflect unsubstantiated allegations by the claimant.  *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990).  In fashioning a hypothetical question to be posed to a VE, the ALJ is required to incorporate only those limitations that he accepts as credible.  *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007) (citing *Casey*

*v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

Here, it is undisputed that the VE testified that there were significant jobs available in the national economy in response to a hypothetical that exactly matched the RFC adopted by the ALJ. Therefore, this assignment of error is without merit.  However, because, as discussed *supra*, the RFC adopted by the ALJ was not based on the totality of the evidence relating to Snead's mental heath impairments, on remand, a new analysis at Step Five may be necessary.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and this case REMANDED for further proceedings consistent with this decision.

s/Jonathan D. Greenberg
Jonathan D. Greenberg
United States Magistrate Judge

Date: August 10, 2020

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**